UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **BERKLEY ASSURANCE COMPANY,** | ) |
| Plaintiff, | ) |
| v. | ) |
| **CBG BUILDING COMPANY LLC,** | ) Civil Action No.: 1:22-cv-01213 |
| Serve:<br>Corporation Service Company<br>100 Shockoe Slip, Fl. 2<br>Richmond, VA 23219-4100 | ) |
| **Defendant.** | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

In this action, plaintiff Berkley Assurance Company ("Berkley") seeks a declaration that defendant CBG Building Company LLC ("CBG") is not entitled to coverage under a Contractor's Protective, Professional, Pollution, Cyber, Media and Mitigation Response Policy issued by Berkley for a claim asserted against CBG by High Real Estate Group a/k/a High Properties, LP ("HP") with respect to the remediation of mold growth at a construction project. Berkley is not obligated to provide coverage for this claim under the policy because, among other reasons, CBG failed to report HP's claim in a timely manner, in breach of the policy's reporting requirements, and also admitted liability for the mold and agreed to and commenced work under a remediation program without notifying Berkley or obtaining its consent, in breach of the policy's voluntary payments provision.

## Parties

1. Plaintiff Berkley is a corporation organized under the laws of Iowa with its principal place of business at 7233 E. Butherus Drive, Scottsdale, Arizona. Berkley is approved to underwrite and issue insurance in Virginia on a surplus lines basis.

2. Upon information and belief, defendant CBG is a limited liability company organized under the laws of Virginia with its principal place of business at 4401 Wilson Boulevard, Suite 600, Arlington, Virginia.

3. According to filings at the Virginia Secretary of State, CBG has five members: Glenn A. Ferguson, Keith Anderson, Douglas G. La Rosa, Michael Holk, and Jim Forberger. Ferguson, Anderson and La Rosa reside in Virginia, while Holk and Forberger reside in California.

4. CBG is a named insured on an insurance policy issued by Berkley to CBG's parent company, CV Services Group LLC ("CV"), which is also organized under the laws of Virginia and maintains a principal place of business at the same address in Arlington as CBG.

## Jurisdiction and Venue

5. This is an action for declaratory judgment pursuant to 28 U.S.C. §2201(a). As detailed below, an actual controversy exists between the parties with respect to their rights and obligations under the policy.

6. This Court has personal jurisdiction over CBG because it maintains its principal place of business in Virginia.

7. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the parties are diverse and the amount in controversy exceeds $75,000.

8.      Venue is proper in this District because the insurance policy at issue was issued for delivery to CV in Virginia, and both CV and CBG maintain their principal place of business in Virginia.

**Factual Background**

*The Policy*

9.      On or about June 1, 2020 Berkley issued Policy No. PCAB-5011814-0620 to CV, with effective dates of June 1, 2020 through June 1, 2021 (hereinafter, the "Policy"). By endorsement, CBG is added as a Named Insured on the Policy.

10.     The Policy provides several types of coverage; however, the coverage relevant to this dispute is "Coverage C. Contractor Pollution Liability," which is a third-party liability coverage.

11.     The insuring agreement for the "Pollution Liability" portion of the Policy provides in relevant part that Berkley shall "defend you against any Pollution Claim . . . and pay on your behalf for all Pollution Loss and Claim Expense for that Pollution Claim in excess of any applicable Self-Insured Retention, provided that:

> 1.      the Pollution Claim arises out of an actual or alleged Pollution Condition that results from the performance of Contractor Activities by you, or by a Responsible Entity for whom you are legally responsible; and
>
> 2.      the Pollution Claim is for Bodily Injury or Property Damage that occurs during the Policy Period, or for Cleanup Costs for a Pollution Condition that occurs during the Policy Period, provided that
>
> a. progressive, continuous, intermittent or indivisible Bodily Injury or Property Damage, or Pollution Condition(s) for which Cleanup Costs are incurred, shall be deemed to have occurred only on the date of first exposure to the Pollution Condition, which is
>
>> i. for Bodily Injury, the date of first exposure of any person to that Pollution Condition; or

3

      ii. for Property Damage or Cleanup Costs, the date the Pollution Condition first commenced.

12. The term "Pollution Claim" is defined to include "the assertion of a legal right alleging liability or responsibility on your part . . . for 'Pollution Loss' arising out of a 'Pollution Condition' resulting from otherwise insured 'Contractor Activities.'"

13. The term "Pollution Loss" is defined to include "any amounts you are legally obligated to pay for . . . Property Damage or Cleanup Costs."

14. The term "Pollution Condition" is defined in relevant part to include "the actual or alleged . . . growth . . . of . . . mold."

15. The term "Cleanup Costs" is defined to include "costs for the investigation, monitoring, or disposal of soil, surface water, groundwater, indoor or outdoor atmosphere or other contamination; clean up, abatement, containment, capping, remediation, or correction of a Pollution Condition resulting from the performance of Contractor Activities."

16. Condition X of the Policy governs Reporting and provides that:

> A. Reporting a Claim or First Party Claim
>
> As a condition precedent to coverage under this Policy, in the event of a Claim or First Party Claim, you must do the following:
>
> 1. Report the Claim or First Party Claim to us in writing as soon as reasonably possible, which (except for a Pollution Claim) must be during the Policy Period, the Automatic Extended Reporting Period, or during any applicable Optional Extended Reporting Period. Reporting should be sent to us at the address stated in the Claims Notice attached to this Policy; . . .

17. Section VIII of the Policy addresses "Multiple Claims" and provides, in relevant part that:

> Two or more Claims . . . arising out of one or more acts, errors, omissions, incidents, events, or Pollution Conditions, or a series thereof, that are related (either causally or logically) will be considered a single Claim . . .

> All such Claims . . . treated as a single Claim . . ., whenever made, shall be considered first made on the date the earliest such Claim . . . was first made, and only a Policy providing coverage for the earliest Claim shall have any coverage for such Claims . . .

18. Section III.E of the Policy sets forth "[CBG's] Duties (All Coverages)" and states, among other things:

> As a condition precedent to this insurance, in the event of any . . . Claim . . .
>
> 3. You shall not voluntarily make any payment, assume or admit any liability, consent to any judgment, settle any . . . Claim, or incur any Claim Expense or Mitigation Cost, for which coverage may be sought under this Policy, without our prior written consent, except for Emergency Expense. We shall not be liable for any payment, assumed or admitted liability, consent judgment, settlement, or Claim Expense to which we have not consented.

19. Section V of the Policy sets forth Exclusions from coverage under the Policy and states, in relevant part:

> We will not be liable to make payments or indemnify you for any . . . Claim or Loss directly or indirectly for or arising out of:
>
> G. liability under contract, agreement, warranty or guarantee, except such liability that would have existed in the absence of such contract or agreement. This Exclusion extends to any contractual obligation to make payments to others, including subcontractors, subconsultants, or their employees, or for materials. . . .

<u>The Project</u>

20. In September 2019, CBG executed a contract with HP for the construction of the Mallard Pointe development (the "Project) in Charlotte, North Carolina. The Project consists of three buildings containing a total of 240 residential units, as well as retail and commercial space.

21. Upon information and belief, the Project was constructed in phases. Building 1 was "closed in" in the fall of 2020 and was finished by April 2021. Building 2 was "closed in" at the end of 2020 and was in the process of being finished as of April 2021. Building 3 was framed and

was in the process of being closed in as of April 2021.

22.     At some point during the Project, a dispute arose between HP and CBG concerning the growth of mold in the residential units and surrounding areas.

23.     No later than March 16, 2021, HP asserted a claim within the meaning of the Policy concerning the mold in the residential units. In a letter dated that day, HP stated that one of its "foremost concerns [was] the presence of mold." HP noted CBG's efforts to address the mold but stated among other things that "[i]t is critical that inspection occurs within every unit in every wall cavity of both Buildings 1 and 2." HP advised that it intended to retain an independent moisture consultant to conduct its own inspections and asserted that CBG was responsible for the cost of these inspections.

24.     CBG did not report this claim to Berkley at the time.

25.     In the weeks that followed, it became apparent that the problem with mold in the residential units at the Project was getting worse. On April 9, 2021, HP sent an email to CBG describing the mold problem as follows:

> It is all over the floors, creeping up the door jambs, on the baseboard, and in some cases on the sheetrock. IT IS EVERYWHERE. Just about every unit on the 3rd floor. The 4th floor is slightly betterer – about ½ of the unit[s] have mold in the same condition. I stopped taking pictures because it was in so many units. Additionally, I developed a headache on the 3rd floor, and half way through the 4th floor I began to develop a cough and both Ryan and I had to step out on a deck to get fresh air. I certainly had a reaction to it.

HP asserted in that email "nothing that was discussed on March 17th has been done . . . to address the mold in Bldg 1 or Bldg 2."

26.     CBG responded to the April 9 email. With respect to the alleged lack of implementation of items discussed during the March 17 meeting, CBG stated "[n]ot the case, but we owe you a complete treatment of the issue."

27. CBG did not report HP's claim or the worsening mold problem to Berkley at the time.

28. Within the next few days, CBG directed its mold consultant, Kynoch Environmental Management ("KEM"), as well as a remediation contractor, Moldstoppers, to investigate and remediate mold in residential units in Buildings 1 and 2. In its inspection log for Building 2, KEM noted that mold was present in units even though they did not appear to be suffering from water intrusion. KEM also noted that gypcrete in Building 2 had not dried correctly. KEM also noted that mold was growing on the floor and under the cabinetwork in some of the affected units. Over the next several weeks, CBG incurred about $32,000 in remediation costs from Moldstoppers, reflecting about 360 person-hours of remediation work.

29. CBG did not report HP's claim or any of its efforts to address the worsening mold problem to Berkley at the time.

30. On May 7, 2021, while KEM's and Moldstoppers' remediation work was in progress, HP issued a Stop Work Order to CBG with respect to all interior work at Building 2 at the Project. The letter asserted that mold was continuing to be "covered up or ignored rather than properly remediated." The letter advised that no further work could occur inside of Building 2 "until a mold remediation documentation and certification plan has been put in place that is mutually agreed upon by the Owner and the Contractor."

31. On May 11, 2021, HP sent a second letter allowing CBG to resume certain interior work in Building 2 at the Project. The letter confirmed that a meeting had occurred on the site the preceding day, May 10. It went on to state that "[HREG] requires, and [CBG] has agreed to implement, the following mold investigation, identification, and remediation measures . . ." A list of 12 measures followed.

32. Among the 12 measures required by HP and agreed to by CBG was that CBG would retain KEM to prepare a remediation program which was to be submitted to HP for approval. Another measure required by HP and agreed to by CBG was the removal of four inches of drywall at the base of all walls to permit inspection of interior wall cavities.

33. CBG did not report the stop work order, its negotiations with HP, or its agreement to HP's demands with respect to the remediation work to Berkley at the time.

34. Over the next few weeks, KEM prepared a remediation program consistent with the measures set forth in the May 11 letter, which was submitted to HP for review and approval, and then implemented it in 10 units in Building 2 at the Project. The remediation program agreed to by CBG and HP has subsequently been the subject of minor modifications. At no point throughout this matter did CBG notify Berkley of the proposed remediation program or any proposed modifications and seek Berkley's consent before agreeing with HP to the proposed terms and committing itself to perform them.

35. As of May 25, 2021, CBG had incurred roughly $49,000 in costs for the initial remediation work by Moldstoppers in Building 2 at the Project and its subsequent work on the 10 units in that building. Upon information and belief, CBG had also incurred substantial costs for services performed by KEM in connection with this work.

36. CBG did not report HP's claim, its agreement to the remediation program, the remediation work it completed, or the substantial remediation costs that it had incurred to Berkley at the time.

*CBG and CV Submit A Renewal Application To Berkley*

37. In April and May of 2021, while the events described above were unfolding, CBG's parent company, CV, was attempting to secure a renewal of the Policy insuring itself and CBG with Berkley. As part of this process, CV submitted on behalf of itself and its subsidiaries, including CBG, certain documents, including an unexecuted application for insurance, to Berkley in April 2021. CV subsequently submitted an executed application for insurance to Berkley dated May 25, 2021. CBG was a proposed insured under the renewal policy, and one of the application responses expressly referred the reader to CBG's website.

38. Section 9(a) of the application form asked, "has any claim, suit, notice or legal action been made or brought (or made earlier and still pending) against your company, its predecessors, or any past or present Principal, Partner, Officer or Director or other prospective insured party of your company?" A follow-up question instructed, "If yes, please provide the following details: 1. Date of Claim, 2. Allegations, 3. Insurance Company Reserve, 4. If closed, total loss payment (indemnity payments plus defense costs), 5. Defense attorney's or insurance company's evaluation of the claim." CV and CBG did not disclose HP's claim regarding the mold at the Project in response to this question in either of the applications submitted to Berkley.

39. Section 8(g) of the application form asked if the proposed insured currently purchased mold and fungus coverage, to which CV and CBG replied "yes." A follow-up question asked if the proposed insured "had any previous mold incidents/claims." CV and CBG did not disclose the mold issues at the Project or HP's claim against CBG.

40. Section 9(b) of the application form asked "[a]re you aware of any other circumstances or incidents which may result in a claim being filed against your company?" CV and CBG responded to this question in the negative.

9

41. Section 9(c) of the application asked "[d]o you know of any circumstance, project problem or delay that could reasonably be expected to result in a claim?" CV and CBG responded to this question in the negative.

42. In reliance upon the application submitted by CV and CBG, Berkley issued a renewal policy to CV and CBG with an effective period from June 1, 2021 to June 1, 2022. The renewal policy was emailed to CBG's broker on June 1, 2021.

### *CBG Begins Remediation Work At The Project*

43. On June 1, 2021, CBG mobilized personnel from KEM and from a remediation contractor to remediate mold in Building 2 at the Project.

44. On June 3, 2021, CBG mobilized a second team, including additional personnel from KEM and from a remediation contractor, to remediate mold in Building 1 at the Project.

45. From June 1 through June 6, 2021, CBG incurred an additional $30,000 in costs for the remediation contractor. Upon information and belief, CBG also incurred significant costs for services provided by KEM during this time period.

46. CBG did not report HP's claim, the remediation program that CBG had agreed to, the mobilization of teams to remediate the mold in Building 1 and Building 2, or the significant costs that CBG was incurring on a daily basis for this work to Berkley at the time.

### *CBG Reports The Mold Issue To Berkley*

47. On June 7, 2021, roughly a week after the account had been renewed for an additional term, CBG, through its broker, reported HP's claim to Berkley. CBG's notice did not accurately portray the events that had occurred over the past three months at the Project.

48. The notice stated that mold had been discovered behind kitchen cabinets in Building 2 on May 15, 2021 and that CBG had investigated the issue further and found mold

behind kitchen cabinets in Building 1. The notice further stated that "there are upwards of 180 rental units that may be impacted and [CBG] is concerned that the mold conditions may result in both project delay as well as a Pollution Claim."

49. The notice further advised that CBG "feels they need to investigate the mold conditions further; they have a preferred mold contractor/consulting firm they'd like to bring in to investigate the mold conditions, potential cause, and evaluate applicable cleanup actions."

50. The notice did not disclose the true nature and extent of the mold problem at the Project, HP's prior claim, CBG's prior investigation of the mold and agreement to remediation programs demanded by HP, or CBG's prior remediation work in accordance with HP's demands.

51. As of that time, CBG's daily expenditures for ongoing mold remediation had increased dramatically to as much as $27,115 per day for its remediation contractor alone. CBG did not disclose to Berkley that it was incurring these expenses.

52. Berkley assigned the matter to John McKinney for further handling. Mr. McKinney promptly sent an acknowledgement of the claim and made several attempts to contact the individual designated in the notice as a contact for CBG and to secure relevant documents from CBG.

53. During a call on June 11, 2021, CBG acknowledged that HP had asserted a claim against CBG for the mold. Mr. McKinney advised that he would need additional documents in order to assess coverage, including documents concerning the discovery of the mold, any reports by KEM, correspondence with the owner, and any correspondence with responsible parties.

54. On June 14, 2021, Mr. McKinney sent a follow-up email renewing his request for the documents and also reserving Berkley's rights. Mr. McKinney advised that he needed the documents to confirm coverage under the Policy and that Berkley's written consent and approval

were required prior to incurring any expenses to mitigate the mold.

55. On June 15, 2021, CBG, through its broker, provided documents to Mr. McKinney. These documents did not include the mold remediation program that had been prepared and agreed to by CBG or any information about the substantial remediation costs being incurred by CBG on a daily basis. Berkley did not have an opportunity to review or approve the remediation program or any of the modifications thereto before CBG agreed to them and committed itself to implementing them.

56. On June 16, 2021, Mr. McKinney asked for additional information about costs and advised that Berkley might want to have its own expert look at the matter. Mr. McKinney also asked that CBG advise him when costs were about to be incurred. CBG did not inform Mr. McKinney that it was continuing to incur substantial costs for remediation work at the Project on a daily basis.

57. It was not until June 21, 2021 that CBG provided any information about the mold remediation program it had negotiated and agreed to with HP. By this time, CBG had committed itself to the program and had been actively performing remediation work at the Project for several weeks. Berkley had no opportunity to review the program or to consider or approve it before CBG committed itself to the program. CBG also for the first time provided information about the projected costs of the remediation program, which was $1.3 million. CBG did not provide any specifics as to costs already incurred as of that time or the substantial costs being incurred on a daily basis. Upon further inquiry from Mr. McKinney, CBG acknowledged that remediation work had already commenced in all three buildings at the Project.

58. It was not until June 23, 2021 that CBG provided any information about the remediation costs that it had already incurred. The information CBG provided was limited and did

not reflect the substantial costs that it was continuing to incur on a daily basis.

59. On June 30, 2021, Mr. McKinney advised orally and by email that coverage for the claim was still under investigation, but that Berkley had identified several coverage issues, including late notice of the claim and possible breach of the voluntary payments provision of the Policy. Mr. McKinney advised that Berkley was investigating other issues as well.

60. CBG's broker sent a letter dated July 8, 2021 asserting that CBG was entitled to coverage. This letter did not accurately portray the events preceding the report of the claim to Berkley. In a subsequent email, the broker advised that the cost of the remediation program was now projected to be $2.3 million.

61. During this time and the weeks that followed, Mr. McKinney made several requests to CBG's broker for all documents concerning mold at the Project and indicated that he would like to receive these documents before he responded to the broker's letter. CBG's broker did not provide any of the documents or indicate that they were forthcoming.

62. By letter dated August 8, 2021, Berkley formally denied coverage for the claim. Among other things, Berkley stated that CBG's notice of HP's claim was untimely and that CBG had admitted and assumed liability for the remediation of the mold in accordance with the remediation program without Berkley's knowledge or consent, in breach of the voluntary payments provision.

63. CBG's broker sent additional correspondence and documents to Berkley and asserted that CBG was entitled to coverage under the Policy for HP's claim.

64. After reviewing the documents, Berkley confirmed its denial of coverage for HP's claim under the Policy.

65. CBG, through counsel, has asserted that it is entitled to coverage under the Policy for HP's claim. CBG's counsel has advised that the costs associated with the mold remediation at the Project are now roughly $6 million.

66. An actual controversy exists between the parties as to whether coverage is available under the Policy for HP's claim with respect to the mold at the Project.

**COUNT I**
**(Declaratory Judgment That CBG's Failure To Timely Report HP's Claim Bars Coverage)**

67. Berkley realleges and incorporates the allegations set forth in paragraphs 1 through 66 as if fully restated herein.

68. There is no coverage for HP's claim under the Policy because CBG failed to report HP's claim as soon as reasonably possible, as required by the Policy.

69. CBG delayed reporting HP's claim in an effort to secure a renewal policy with Berkley at a more favorable price.

70. CBG's conduct constitutes a substantial and material breach of the reporting provisions of the Policy.

71. Berkley has been prejudiced by CBG's substantial and material breach of the reporting provisions of the Policy.

72. CBG's substantial and material breach of the reporting provisions bars coverage for HP's claim under the Policy.

73. Berkley is entitled to a judgment declaring that there is no coverage for HP's claim under the Policy.

## COUNT II
**(Declaratory Judgment That The Policy's Voluntary Payments Provision Bars Coverage)**

74. Berkley realleges and incorporates the allegations set forth in paragraphs 1 through 73 as if fully restated herein.

75. CBG committed itself to a resolution of HP's claim by acknowledging responsibility for the mold and by negotiating, agreeing to, and commencing implementation of a remediation program for the mold at the Project, all without notice to or the consent of Berkley.

76. CBG admitted liability for the mold and assumed liability for the remediation program without notice to Berkley or Berkley's written consent, in violation of the voluntary payments provision in the Policy.

77. CBG's conduct constitutes a substantial and material breach of the voluntary payments provision in the Policy that bars coverage for HP's claim.

78. CBG's breach of the voluntary payments provision of the Policy has prejudiced Berkley.

79. Berkley is entitled to a judgment declaring that the voluntary payments provision bars coverage for HP's claim under the Policy.

## COUNT III
**(Declaratory Judgment That The Policy's Contractual Liability Exclusion Bars Coverage)**

80. Berkley realleges and incorporates the allegations set forth in paragraphs 1 through 79 as if fully restated herein.

81. Upon information and belief, some or all of the amounts for which CBG seeks coverage under the Policy are liabilities that exist solely by virtue of CBG's contract with HP and would not exist at common law.

82. The Policy's contractual liability exclusion bars coverage for some or all of HP's claim.

83. Berkley is entitled to a judgment declaring that the contractual liability exclusion bars coverage for some or all of HP's claim.

WHEREFORE, Berkley respectfully requests that this Court enter judgment:

A. Declaring that there is no coverage available under the Policy for HP's claim because the claim was not timely reported to Berkley, in breach of the notice provisions of the Policy;

B. Declaring that the voluntary payments provision precludes coverage for HP's claim;

D. Declaring that the contractual liability exclusion precludes coverage for some or all of HP's claim; and

E. Granting such further relief as the Court deems just and equitable.

**Respectfully submitted,**

**BERKLEY ASSURANCE COMPANY**

/s/ John B. Mumford, Jr.
John B. Mumford, Jr. (VSB No. 38764)
Jessica A. Swauger (VSB No. 89612)
Hancock, Daniel & Johnson, P.C.
4701 Cox Road, Suite 400
Glen Allen, VA 23060
jmumford@hancockdaniel.com
jswauger@hancockdaniel.com
Telephone: (804) 967-9604
Facsimile: (804) 967-9888
*Counsel for Berkley Assurance Company*